**LAWRENCE PRINT WORKS, Inc., et al. v. LYNCH et al., Board of Assessors.**
**Civil Action No. 2255.**

District Court, D. Massachusetts.

Nov. 10, 1943.

Tyler & Reynolds and George B. Rowlings, all of Boston, Mass., for plaintiff.

James P. Kane, City Sol., of Lawrence, Mass., for defendant.

FORD, District Judge.

The plaintiff corporations are print works (processing cotton, rayon, etc.,) organized under the laws of the State of Delaware. The individual plaintiff, Bernard R. Armour, is a citizen of New Jersey and a director and large stockholder in The Aspinook Corporation (hereinafter called Aspinook). The defendants are the present assessors of the City of Lawrence, Massachusetts. The action seeks specific performance of an oral contract alleged to have been made on July 14, 1941, between the plaintiff Armour, acting on behalf of

himself and Aspinook, and the 1941 Board of Lawrence Tax Assessors (Messrs. Doyle, Lynch, and O'Connor) to abate certain taxes for the years 1941 and 1942 in the amounts of $11,640.82 and $30,833.68, respectively, and assessed in 1941 upon the Pacific Mills, Inc. (hereinafter called Pacific), a Massachusetts corporation, operating a print works in the City of Lawrence, and in 1942 upon The Lawrence Print Works, Inc. (hereinafter called Lawrence.)[1] Consideration for the assessors' promise to abate is alleged to have been a promise of Armour and Aspinook to organize and finance a new company (Lawrence) to take over Pacific, whose business was unprofitable, and operate the latter's plant without cessation of business. Jurisdiction is based on diversity of citizenship. 28 U.S.C.A. § 41(1) (b).

The defendants have filed: (1) A motion to dismiss, the main ground of which is that the plaintiffs fail to state a claim upon which relief could be granted. Hearing on this motion was ordered deferred until trial. (2) An answer in which, among other defenses not necessary to explore in the view reached here, the defendants denied the existence of the alleged agreement and renewed their contention of failure to state a claim for relief.

The questions to be resolved are: (1) Did the 1941 assessors make the alleged agreement and (2) if so, was it valid under the provisions of Massachusetts General Laws (Ter.Ed.) c. 58, sec. 8, as amended in c. 322, sec. 1, Massachusetts Acts and Resolves of 1935, upon which provisions the plaintiffs rely for relief? The material part of this statute appears in the margin.[2]

The first issue here requires a somewhat detailed recital and, later, a discussion of the evidence because of the plaintiffs' approach to a solution of their tax problems.

In deciding this issue it must be borne in mind that the burden of proof rests upon the plaintiffs to prove the existence of the contract alleged to have been made by the assessors.

The facts and conclusions of fact concerning it are as follows:

In 1941, Pacific found itself unable to conduct its print works profitably. Seeking a customer to buy its plant, it interested the plaintiff Armour as a prospective purchaser. The latter, on behalf of himself and Aspinook, engaged in a business similar to Pacific's, at some time immediately prior to July of 1941 made an offer to purchase Pacific with a view to continuing its operation without interruption, an obvious economic benefit to the City of Lawrence. The tax burden of Pacific gave Armour concern. He decided that Pacific's annual tax burden would prevent raising capital and impede successful competition with similar enterprises. Through an intermediary, Armour, on July 14, 1941, made an appointment with Mr. Walter A. Griffin, then Mayor of the City of Lawrence, with the idea in mind of lessening the tax obligations of Pacific. The Mayor, after hearing Mr. Armour's proposal to form a new company, buy Pacific, and carry on the business, and after hearing his reasons for wanting a tax reduction, sent for the then assessors (Chairman Doyle, Lynch, and O'Connor) "to listen to what Mr. Armour had to say". A meeting was then held in the office of the Mayor on July 14, 1941.

It should be borne in mind that the Mayor of Lawrence under that city's charter did not appoint the tax assessors. The latter were appointed by the city council. Massachusetts Acts and Resolves, 1911, c. 621, Part I, sec. 9 and Part II, sec. 42. The Mayor had no power to abate taxes. Cf. Massachusetts Statutes, Ter.Ed. c. 58, sec.

[1] Lawrence was organized August 8, 1941; Pacific's property was taken over August 18, 1941; title passed from Pacific to Lawrence, December 12, 1941, and the latter has operated Pacific to date. An assignment of a purported agreement to abate 1941, 1942, and 1943 taxes was made to Lawrence by Armour and Aspinook, August 14, 1941.

[2] "Proceedings against certain delinquent collectors. Abatement of certain uncollected taxes.— * * * If, at any time after the commitment of any warrant to a collector, the commissioner is of the opinion that any taxes, assessments or other charges thereon remaining uncollected should be abated, he may authorize the assessors or board making the assessment, in writing, to abate any part or the whole of such taxes, assessments or other charges, either by items or by abatement of a sum total, stated in such written authorization. The assessors or board aforesaid may thereupon make the abatement authorized and enter the same in their record of abatements, making reference in said record to such authorization as the cause or reason for the abatement." (1935, c. 322, sec. 1, appvd. June 5, 1935. Declared an emergency law.)

8, as amended, and c. 59, sec. 59, as amended, St.1939, c. 250, § 1; also Dowling v. Board of Assessors of Boston, 268 Mass. 480, 484, 168 N.E. 73; Hough v. City of North Adams, 196 Mass. 290, 293, 82 N.E. 46; Harrington v. Glidden, 179 Mass. 486, 490, 61 N.E. 54, 94 Am.St.Rep. 613.

With respect to the meeting of July 14, 1941, Mr. Armour testified that he told the assessors he was about to complete a deal with Pacific and that unless he got a reduced tax bill for the balance of 1941, and for 1942, 1943, 1944, and 1945 he would not go ahead. He stated he wanted a pro rata tax of $15,000 for the unexpired part of 1941 and $15,000 for the ensuing years. At no time did Armour state that he desired an agreement to abate—the basis on which relief is sought here. However, there is no question that he was seeking an abatement for the future. That it was an abatement the plaintiffs were seeking, rather than an agreement to abate, is evidenced by the testimony of Mayor Griffin who stated "it was an abatement they were seeking * * *. I felt it * * * would be for the best advantage of the city to allow this abatement * * *". Armour had no knowledge of the provisions of c. 58, sec. 8, as amended, which makes no mention of agreements to abate, and it is fair to infer also that he knew nothing of the provisions of the ordinary abatement statute c. 59, sec. 59, as amended,[3] which also had no provision for an agreement to abate. He was not represented by an attorney although an executive assistant, a Mr. Goell, who was present at the conference, was an attorney, but he attempted no legal approach to the subject matter assuming that such could have been made at this point. The question of the assessors' power to make such a contract was not raised.

I have not the slightest doubt that Mr. Armour left the conference of July 14 without an agreement to abate between the assessors and himself—the gravamen of the plaintiffs' complaint. The Mayor himself, called by the plaintiffs, stated when asked as to the exact attitude of the assessors at the July 14 conference that, "They [the assessors] felt as though they would cooperate", and in reply to further questions he stated that the assessors "tentatively agreed" but "they couldn't say then that they would absolutely grant that abatement until they received the approval of Mr. Long who was the Tax Commissioner". Further, the Mayor was careful to inform plaintiffs' counsel at the trial that whatever agreements were made had been made between the assessors and himself only.

The 1941 assessors, Chairman Doyle, Lynch, and O'Connor, all testified, the latter by deposition, that no agreement was made to abate any taxes at the July 14 meeting. O'Connor testified that Chairman Doyle stated "that before we did anything he would want to talk it over with the Commissioner [Massachusetts Commissioner of Taxation]." Mr. Lynch testified the "meeting [July 14] broke up with nothing definite being done". Mr. Doyle testified "we definitely told them [plaintiffs] the last thing before that meeting adjourned that we would take no definite action on the matter then and not until such time as we had consulted Commissioner Long and found out what his attitude might be".

Whatever was the understanding of Mr. Armour and his associates, the conclusion is inescapable that no agreement with Mr. Armour was made by the assessors to abate any tax at the meeting of July 14. The most he was justified in assuming after that conference was that the Mayor was well disposed; the assessors possibly; and that in any event the assessors would wait until Commissioner Long's attitude was ascertained. The plaintiffs fall short of sustaining the burden of proving a contract to abate taxes was consummated on July 14, the day they alleged in their complaint it was made.

That no definite agreement was made between Armour and the assessors on July 14 is borne out by the letter of Tax Commissioner Long, dated July 15, 1941, and written after a visit to him by Chairman Doyle, Mr. Armour and others to ascertain his attitude. The Commissioner addressed a letter to the Lawrence Board of Assessors purporting to give authority "to the extent it is capable of being given" to the Board under c. 58, sec. 8, as amended, to abate taxes for the years 1942 and 1943 (nothing

---

[3] "Abatements.—A person aggrieved by the tax assessed upon him may, except as hereinafter otherwise provided, on or before October first of the year to which the tax relates, apply in writing to the assessors, on a form approved by the commissioner, for an abatement thereof, and if they find him taxed at more than his just proportion, or upon an assessment of any of his property in excess of its fair cash value, they shall make a reasonable abatement; * * *."

was said of the 1941 tax), and stating that the purported authority was given to "meet the arrangement suggested". This letter is silent with respect to any agreement being made by the assessors with the Mayor or any one else.

■ Inasmuch as this letter of July 15 was invalid as an authority to abate taxes on the ground that it was written before the warrant to the collector issued on July 18, 1941, it might be well to state here that Commissioner Long did, however, on February 19, 1943, give valid authority under c. 58, sec. 8, as amended, to the then assessors (Lynch, Fluet, and Lord) to abate the 1941 and 1942 taxes. In his letter of that date granting authority, he states it is his understanding an agreement to abate taxes was made "on or about July 14". However, Mr. Long's earlier recollection of 1941 that the conferences of July 14 had reached only the "suggestion" stage is necessarily better than his recollection two years later, in 1943, that an agreement had been concluded. His statement of February 19, 1943, is merely a conclusion formed after a long lapse of time and is based, as he says, on his understanding and not on any affirmative evidence of an agreement that I can find set forth either in his letters of July 15, 1941, and February 19, 1943, or in his deposition taken recently.

It might also be stated that Commissioner Long asked the assessors in his letter of July 15, 1941, to write him a letter "to the effect that they will recognize this authority". He would hardly have done this if an agreement were already made, believing, as he testified, that such agreements were binding on the assessors. No reply to this suggestion was made by the assessors.

However, when the 1943 assessors (Lynch, Lord, and Fluet) received the letter of February 19, 1943, in which Mr. Long stated it was his understanding there was a definite agreement to abate between the assessors and Armour, the Board, as reflected by its records which were in evidence, in the only formal meeting held by them with respect to the matter involved, voted to take no action with respect to it on the ground that neither Chairman Doyle nor Assessor Lynch ever made any agreement with Mr. Armour to abate.

Although, as I understand the plaintiffs' pleadings and argument, they rely on an agreement supposedly made on July 14, 1941, yet it may be well to summarize briefly the facts with respect to a meeting of July 16, 1941, which was called by the Mayor in the City Council Chamber. Only two of the 1941 assessors—Lynch and O'Connor—were present at that meeting. Mr. Armour was not present. Chairman Doyle was not present. The Mayor explained the latter's absence by stating his presence was not necessary as he was about to retire in a few days and would not take part in the abatement of any future taxes. It would appear that if the Mayor or the plaintiffs were attempting to get a contract or agreement to abate taxes, it would be important to have Chairman Doyle present. The conclusion is compelled that no definite action was intended to be taken that would extend beyond Mr. Doyle's retirement. It seems certain that if the Mayor, on behalf of the plaintiffs, was attempting to effectuate a binding agreement to abate and not merely trying to generate a favorable attitude on the part of the assessors when the time came to pass upon the abatements, Mr. Doyle's presence was of paramount importance. It is perfectly apparent from the Mayor's attitude with respect to Doyle's presence that there was no attempt to secure from the assessors an agreement to abate, but only to insure what their attitude would be toward an abatement if and when the matter was presented and after authority had been received from the Tax Commissioner.

To recapitulate, the whole picture here is plain. Mr. Armour and his associates misconceived the power of the Mayor. Mr. Armour concluded in the first instance that a favorable disposition on the Mayor's part was enough for all practical purposes. Mr. Armour was informed for the first time on July 14 that inasmuch as the valuations of the property were considered fair, and Mr. Armour did not deny that they were, the only relief for the plaintiffs was under c. 58, sec. 8, as amended, and nothing could be done under that provision except after the Tax Commissioner had decided the abatement was in the public interest and granted authority. Codman v. Assessors of Westwood, 309 Mass. 433, 437, 35 N.E.2d 262. That authority they attempted to secure the next day. But although the letter of July 15 did not constitute a valid authority because of the fact it was given before the 1941 tax warrant issued on July 18, 1941, Mr. Armour assumed it was valid. He assumed further that at this point all the public officials were favorable whom he

regarded as having power to grant a tax reduction. He did not even return to see the Mayor. Mr. Armour took too much for granted. He interpreted what seemed to him a favorable attitude on the part of all into an agreement to abate by the assessors, who, in the last analysis, had the final discretionary power to abate exclusively. It fell far short of such an agreement. The denials of the assessors testify to this as does the testimony of the Mayor, who, at best, testified the assessors only agreed or stated they would "cooperate".

Under all the circumstances, a belief by Mr. Armour that he had an agreement to abate with the assessors was not justified.

It is my conclusion the plaintiffs have failed to establish by a fair preponderance of the evidence the existence of the contract upon which they expect relief.

In view of this factual conclusion, it will be unnecessary to pass on the other questions involved here. The plaintiffs cannot recover in this action.

Judgment for the defendants with costs.